Lauren Kim, State Bar No. 337064
lkim@nixonpeabody.com
NIXON PEABODY LLP
300 S. Grand Avenue, Suite 4100
Los Angeles, CA 90071-3151

Michael J. Summerhill (pro hac pending)
Ethan E. Trull (pro hac pending)
Keith E. Edeus, Jr. (pro hac pending)
NIXON PEABODY LLP
70 W. Madison Street, Suite 5200
Chicago, IL 60602
Ph.: 312.977.4400
Fax: 312.977.4405

Attorneys for Plaintiffs
MANGO DUNDAS, LLC, MANGO LENDING COMPANY, LLC, and
SARAH SIEGEL-MAGNESS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANGO DUNDAS, LLC, a Colorado limited liability company, MANGO LENDING COMPANY, LLC, a Colorado limited liability company, SARAH SIEGEL-MAGNESS, individually, and derivatively on behalf of nominal defendant, Dundas World Limited,<br><br>Plaintiffs,<br><br>v.<br><br>PETER HYDE DUNDAS, and EVANGELO BOUSIS,<br><br>Defendants,<br><br>and<br><br>DUNDAS WORLD LIMITED (in Liquidation), a company incorporated under the laws of England and Wales,<br><br>Nominal Defendant. | CASE NO.: 2:24-CV-07543<br><br>**VERIFIED COMPLAINT FOR:**<br><br>1. **Fraudulent Concealment;**<br>2. **Fraudulent Inducement;**<br>3. **Uniform Voidable Transfer Act (Actual Fraud);**<br>4. **Uniform Voidable Transfer Act (Constructive Fraud);**<br>5. **Declaratory Judgment**<br>6. **Unjust Enrichment;**<br>7. **Money Had and Received;**<br>8. **Shareholder Derivative Action**<br><br>**JURY TRIAL DEMANDED** |

NOW COME the Plaintiffs, Mango Dundas, LLC ("**Mango Dundas**"), Mango Lending Company, LLC ("**Mango Lending**") and Sarah Siegel-Magness ("**Mrs. Siegel-Magness**") (collectively, "**Plaintiffs**"), by and through their attorneys, Nixon Peabody LLP, and as and for their Complaint against Defendants Peter Hyde Dundas ("**Dundas**"), Evangelo Bousis ("**Bousis**") (collectively, "**Defendants**") and nominal Defendant Dundas World Limited (in Liquidation) (the "**Company**"), state as follows:

## INTRODUCTION

1.      Plaintiffs bring this action against Defendants to recover more than $15 million in damages they have suffered after Defendants fraudulently induced Plaintiffs to invest in their UK-based luxury fashion design business. From the outset, Defendants: (i) used the investment for their own purposes rather than for legitimate business purposes; (ii) to permitted the Company to become insolvent; (iii) transferred the Company's valuable intellectual property to themselves and used that intellectual property to open a new business in California in which Mrs. Siegel-Magness would have no interest. Plaintiff Mango Dundas, a shareholder of the Company, also brings a derivative action against Defendants for breach of their fiduciary duties to the Company.

## THE PARTIES

2.      Plaintiff Mango Dundas is a Colorado limited liability company that maintains its principal place of business at 4643 S. Ulster Street, Suite 1400, Denver, Colorado 80237. Mango Dundas's members are Gary Magness and Mrs. Siegel-Magness, who are both domiciled in and reside in the state of Florida.

3.      Plaintiff Mango Lending is a Colorado limited liability company that maintains its principal place of business at 4643 S. Ulster Street, Suite 1400, Denver, Colorado 80237. Mango Lending's sole member is Gary Magness, who is domiciled in and resides in the state of Florida.

4.      Plaintiff Mrs. Siegel-Magness is a natural person who is domiciled in the state of Florida.

4861-4811-9006.3

5.    Dundas is a natural person and citizen of Norway who, on information and belief, is domiciled in the state of California.

6.    Bousis is a natural person and citizen of Greece who, on information and belief, is domiciled in the state of California.

7.    Dundas World Limited (in Liquidation), is a company incorporated under the laws of England and Wales whose registered office is at Riverbank House, 2 Swan Lane, London 3TT.

## JURISDICTION AND VENUE

8.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that this is a civil action between citizens of different states in which complete diversity exists and the matter in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of costs and interest.

9.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(1), in that the Defendants reside in this district.

## ALLEGATIONS APPLICABLE TO ALL CLAIMS

10.    Dundas is a high-end fashion designer who has worked as an assistant or artistic director for Jean Paul Gaultier, Emanuel Ungaro, Roberto Cavalli, Emilio Pucci, and others. Dundas's designs have been worn by celebrities such as Beyonce, Ciara, Michelle Obama, and Bella Hadid.

11.    Bousis is also a designer and is Dundas's spouse.

12.    Mrs. Siegel-Magness is a high net worth individual, Oscar-nominated movie producer and director, entrepreneur, and investor. Mrs. Siegel-Magness and her husband, Mr. Gary Magness, hold an interest in a variety of business ventures including Smokewood Entertainment, which is committed to the creation of thought-provoking and social-justice minded films.

13.    On or about March 24, 2017, Dundas and Bousis founded the Company. At all relevant times, the Company was engaged in designing and selling luxury fashion

items.

14.    Defendants were directors of the Company and owed the following duties to the Company under the Companies Act 2006 of the laws of England and Wales:

(A)    <u>Companies Act 2006, Section 171 – Duty to Act Within Powers</u>: A director of a company must—(a) act in accordance with the company's constitution, and (b) only exercise powers for the purposes for which they are conferred.

(B)    <u>Companies Act 2006, Section 172 – Duty to Promote the Success of the Company</u>: (1) A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (amongst other matters) to—(a) the likely consequences of any decision in the long term, (b) the interests of the company's employees, (c) the need to foster the company's business relationships with suppliers, customers and others, (d) the impact of the company's operations on the community and the environment, (e) the desirability of the company maintaining a reputation for high standards of business conduct, and (f) the need to act fairly as between members of the company.

(C)    <u>Companies Act 2006, Section 173 – Duty to Exercise Independent Judgment</u>: (1) A director of a company must exercise independent judgment.

(D)    <u>Companies Act 2006, Section 174 – Duty to Exercise Reasonable Care, Skill and Diligence</u>: (1) A director of a company must exercise reasonable care, skill and diligence. (2) This means the care, skill and diligence that would be exercised by a reasonably diligent person with— (a) the general knowledge, skill and experience that may reasonably be expected of a person carrying out the functions carried out by the director in relation to the company, and (b) the general knowledge, skill and experience that the director has.

(E)    <u>Companies Act 2006, Section 175 – Duty to Avoid Conflicts of Interest</u>:  (1) A director of a company must avoid a situation in which he has, or can have, a direct or indirect interest that conflicts, or possibly may conflict, with the interests of the company. (2) This applies in particular to the exploitation of any property, information or opportunity (and it is immaterial whether the company could take advantage of the property, information or opportunity). (3) This does not apply to a conflict of interest arising in relation to a transaction or arrangement with the company.

(F)    <u>Companies Act 2006, Section 176 – Duty to Not Accept Benefits from Third Parties</u>: (1) A director of a company must not accept a benefit from a third party conferred by reason of—(a) his being a director, or (b) his doing (or not doing) anything as director.

(G)    <u>Companies Act 2006, Section 177 -Duty to Declare Interest in Proposed Transaction or Arrangement</u>: If a director of a company is in any way, directly or indirectly, interested in a proposed transaction or arrangement with the company, he must declare the nature and extent of that interest to the other directors.

(H)    <u>Companies Act 2006, Section 178 -Civil Consequences of Breach of General Duties</u>: (1) The consequences of breach (or threatened breach) of sections 171 to 177 are the same as would apply if the corresponding common law rule or equitable principle applied. (2) The duties in those sections (with the exception of section 175 (duty to exercise reasonable care, skill and diligence)) are, accordingly enforceable in the same way any other fiduciary duty owed to a company by its directors.

15.    At all relevant times prior to September 12, 2018, Dundas and Bousis were the sole owners of certain intellectual property consisting of the "Dundas" trademark and related, trademarked logos (the "**Brand**").

16.     Beginning in approximately early 2018, Mrs. Siegel-Magness and Mr. Gary Magness and their representatives engaged in discussions with Dundas and Bousis about potentially acquiring an ownership stake in the Company.

17.     As these discussions progressed, Mrs. Siegel-Magness and Mr. Gary Magness created Mango Dundas to be the vehicle through which they would potentially invest in the Company.

18.     The parties' initial discussions resulted in the execution of a non-binding term sheet dated on or about April 30, 2018 (the "**Term Sheet**"), which reflected the parties' intent to continue negotiating towards an agreement under which Mango Dundas would invest 5 million euro in exchange for, among other things,  Series A Preferred Shares amounting to roughly a 20% stake in the Company and the right to appoint one director and, subject to additional requirements, one board observer, to the board of directors (the "**Board**").

19.     The Term Sheet also reflected the parties' intention that as long as Mango Dundas held Series A Preferred Shares convertible into at least 7.5% of the issued and outstanding Ordinary Shares, the Company would not take certain actions without the written consent of Mango Dundas, including terminating, liquidating, dissolving or winding up the Company.

20.     On or about April 30, 2018, and based on the Term Sheet, Mango Dundas wired 500,000 euro to the Company to be credited toward the price of its equity stake.

21.     Thereafter, Mango Dundas and Dundas and Bousis continued their negotiations, during which Mango Dundas invested another one million euro in the Company, bringing Mango Dundas's total pre-closing investment to 1,500,000 euro.

22.     Throughout the negotiations, Mango Dundas and Mrs. Siegel-Magness reasonably believed that Dundas and Bousis were honest in their stated intention to use investments to drive the Company's business. But Plaintiffs were deceived; Dundas and Bousis used the Company and Plaintiffs' loans and investments to support their lavish

4861-4811-9006.3

personal lifestyle and to build the Dundas brand, which they used in connection with other businesses, including a cosmetics business.

23.    On August 25, 2018, in anticipation of closing the deal with Mango Dundas, Dundas and Bousis entered into Employment Agreements with the Company (collectively, the "**Employment Agreements**") wherein Dundas and Bousis agreed, among other things, that during their employment and until the third anniversary of any termination thereof they would not use any trade name or fictitious names encompassing the Brand, or any derivation, variation or part of the Brand, or any name confusingly similar to the Brand, in each case save for the ability to identify themselves.

24.    The negotiations between Mango Dundas and the Company culminated in a series of agreements entered on or about September 12, 2018 (collectively, the "**2018 Agreement**"), which included:

(A)    that certain Shareholder's Agreement Relating to Dundas World Limited (the "**2018 Shareholder's Agreement**") among Mango Dundas, Dundas, Bousis, V&H Trading Ltd. ("**V&H**"), and the Company[1];

(B)    that certain Trade Mark Assignment Deed (the "**Peter IP Deed**") whereby Dundas assigned to Dundas World IP Limited, a company incorporated under the laws of England ("**Dundas IP**") all Dundas's rights to the Brand together with: (i) all goodwill associated herewith; (ii) any and all royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to the Brand; and (iii) the right to bring and defend claims and causes of actions, and to obtain and retain any relief recovered in respect of every act of infringement, or other causes of action arising from ownership of the Brands;

---

[1] A true and correct copy of the 2018 Shareholder's Agreement is attached hereto as **Exhibit 1**.

4861-4811-9006.3

(C)    that certain Trade Mark Assignment Deed (the "**Evangelo IP Deed**") (together with the Peter IP Deed, the "**IP Deeds**") whereby Bousis assigned to Dundas IP all of Bousis's rights to the Brand together with: (i) all goodwill associated herewith; (ii) any and all royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to the Brand; and (iii) the right to bring and defend claims and causes of actions, and to obtain and retain any relief recovered in respect of every act of infringement, or other causes of action arising from ownership of the Brands;

(D)    that certain License Agreement (the "**License Agreement**") between the Company and Dundas IP pursuant to which Dundas IP granted the Company a license to use the Brand in France, EU, USA, China, Korea, Singapore, Turkey, Japan, Russia, Norway, Mexico, Macao, Taiwan, and Hong Kong, and which provided that all trademarks, designs, copyright or other intellectual property rights acquired or developed during the term of the license (collectively and together with the Brand, the "**IP Assets**") would belong to Dundas IP to be accessed and controlled by the Company under the terms of the License Agreement; and

(E)    that certain Subscription Agreement for Series A Shares in Dundas World Limited (the "**Subscription Agreement**") between the Company and Mango Dundas pursuant to which Mango Dundas agreed to invest an additional 3,499,964 euro, bringing Mango Dundas's total investment in the Company, as of that date, to 4,999,964 euro, in exchange for 589,023 new Series A Shares in the Company.

25.    At all relevant times after the 2018 Agreement, the Company's single most valuable asset was its license interest in the Brand and IP Assets. This was not unusual because in the high-end, couture fashion industry, of which the Company was a part, value is substantially driven by monetizing trademarks, designs, goodwill, and other

intangibles, often associated with a high-profile individual like Dundas.

26.   The IP Deeds and License Agreement were intended to protect the Brand and prevent misuse by Dundas and Bousis by placing ownership with Dundas IP and prohibiting Dundas IP from doing anything with the Brand other than license it to the Business for use in "luxury fashion including clothing, shoes, handbags, jewelry, sunglasses and other accessories; cosmetics; perfume; and small leather goods…."

27.   However, the IP Deeds and License Agreement also provided an opportunity for Dundas and Bousis to scam potential investors like Mango Dundas, provided they were willing to act in bad faith and violate their fiduciary duties as officers and directors of the Company. The IP Deeds provided that in the event the License Agreement was terminated, the Brands would be reassigned to Dundas and Bousis, respectively. The License Agreement, in turn, stated it would terminate upon, among other things, the occurrence of an "Insolvency Event" concerning the Company.

28.   This contractual arrangement made it possible for Dundas and Bousis to entice investment in and loans to the Company on the strength of the popular Dundas Brand and designs, and then engage in mismanagement and self-dealing with the knowledge that these valuable assets were never at risk and would simply revert to Dundas and Bousis in the event the Company became insolvent, which it eventually did.

29.   Almost 40% of the funds contributed by Mango Dundas under the Subscription Agreement were used to repay purported loans to the Company from Dundas and Bousis or their related entities.

30.   Specifically, the monies paid by Mango Dundas were to be used to pay $798,000 to Bousis, purportedly in satisfaction of a promissory note evidencing a loan from Bousis to the Company, and another 1,100,000 euro to V&H, again purportedly in satisfaction of a promissory loan evidencing a loan from V&H to the Company. On information and belief, V&H is an entity owned and/or controlled by Dundas.

4861-4811-9006.3

31.     Although requested to do so, Dundas and Bousis failed to supply Plaintiffs with documentation to corroborate that these alleged prior loans to the Company were in fact funded and valid.

32.     Following the 2018 Agreement, Dundas and Bousis were principally responsible for the operations of the Company.

33.     Mango Dundas purchased additional equity shares in the Company on three occasions: (i) pursuant to an Application Letter dated September 21, 2022, Mango Dundas acquired additional Series A Shares at a purchase price totaling 3,300,000 euro; (ii) by Subscription Agreement dated on or about October 10, 2018, Mango Dundas acquired more Series A Shares at a purchase price of 775,917 euro; and (ii) and again in January of 2023, Mango Dundas acquired more Series A Shares for a purchase price totaling 1,500,000 euro.

34.     In addition to funds contributed in exchange for equity interests in the Company, Mango Dundas also made several substantial loans to the Company, including:

> (A)     a Line of Credit Loan Agreement dated May 5, 2021, by and between Mango Dundas, as lender, and the Company, as borrower, in the original principal amount of 500,000 euros;

> (B)     a Convertible Promissory Loan Agreement dated January 21, 2022, by and between Mango Dundas, as lender, and the Company, as borrower, in the original principal amount of 500,000 euros; and (iii) a Convertible Promissory Loan Agreement dated May 18, 2022, by and between Mango Dundas, as lender, and the Company, as borrower, in the original principal amount of 500,000 euros.

35.     In addition, Mango Dundas's affiliate, Mango Lending made loans to the Company: (i) a loan on or about April 18, 2019, in the amount of 650,000 euros and (ii) a loan made on or about June 27, 2019 in the amount of 350,000 euros.

4861-4811-9006.3

36.    Plaintiffs invested in and made loans to the Company based on their belief that Dundas and Bousis were committed to placing the interests of the Company and its investors and creditors above their own interests.

37.    On or about May 12, 2022, Plaintiffs was informed that the Company was in financial distress and had defaulted on payment of certain of its obligations.

38.    Plaintiffs did not discover the Company's financial distress sooner because Dundas and Bousis did not keep proper books and records, did not respond to requests for financial information, and did not call regular board meetings.

39.    In response to the financial distress, Mango Dundas reached out to Dundas and Bousis to discuss providing a loan to the Company in the amount of 200,000 euro to allow the Company to pay certain overdue amounts. Given the Company's financial condition, Mango Dundas proposed that the loan be secured as an "all monies" and qualifying floating charge – both of which are standard market practice in lending under the laws of England and Wales (and not only in distressed positions).

40.    The Company, at the direction of Dundas and Bousis, unreasonably refused the loan and the unpaid obligations remained in default.

41.    Plaintiffs subsequently ascertained that the financial distress of the Company was in fact due to mismanagement by Dundas and Bousis, who used the Company's assets to maintain a lavish personal lifestyle, rendering the Company insolvent.

42.    Alarmed by the deteriorating financial condition of the Company and the potential loss of $15 million Plaintiffs had loaned and invested, Mango Dundas engaged consultants at its own expense to develop a turnaround plan to reorganize the Company.

43.    Mango Dundas presented its reorganization plan to Dundas and Bousis and the Board of Directors in August of 2023 (the "**Reorganization Plan**"). The Reorganization Plan involved, *inter alia*, bringing in new management, moving operations to the United States, and procuring additional investment by Mango Lending

11

COMPLAINT BY PLAINTIFFS MANGO DUNDAS, LLC, MANGO LENDING
COMPANY, LLC, AND SARAH SIEGEL-MAGNESS- CASE NO. 24-7543
4861-4811-9006.3

and others to acquire a controlling share of the Company.

44.     Under the Reorganization Plan, the Company would have regained solvency.

45.     At the direction of Dundas and Bousis, the Company rejected the Reorganization Plan and instead caused the Company to go into a liquidation that would otherwise have been avoided.  Dundas and Bousis made the liquidation appointment themselves and without the participation and agreement of Plaintiffs.

46.     By operation of the License Agreement and IP Deeds, the insolvency and liquidation of the Company purportedly caused the Brand and associated IP Assets to revert to the ownership of Dundas and Bousis but for the reasons stated herein that transfer should be set aside.

47.     Besides the Brand and IP Assets, the other valuable assets of the Company largely consisted of samples and patterns of couture designs (the "Designs"). Dundas and Bousis absconded with these Designs after they put the Company into liquidation.

48.     On information and belief, even before they initiated liquidation proceedings against the Company in the United Kingdom, Dundas and Bousis relocated to California where they have since engaged in business utilizing the Brand and IP Assets, and possibly the Designs.

49.     In particular, following the liquidation of the Company, Plaintiffs have observed several instances where high-profile individuals have worn Dundas designs, proving that Dundas and Bousis are continuing to use the Designs, IP Assets, and Brand to sell couture for their personal benefit.

50.     Moreover, Dundas and Bousis presently are engaged in a high-end cosmetics venture, again utilizing the Brand and IP Assets.

/ / /

/ / /

/ / /

COMPLAINT BY PLAINTIFFS MANGO DUNDAS, LLC, MANGO LENDING
COMPANY, LLC, AND SARAH SIEGEL-MAGNESS- CASE NO. 24-7543

4861-4811-9006.3

## COUNT ONE
### FRAUDULENT CONCEALMENT
**(Against All Defendants)**

51.     Plaintiffs restate and reallege Paragraphs 1 through 50 of the Complaint as if fully set forth in this Paragraph.

52.     Dundas and Bousis engaged in a fraudulent scheme whereby they solicited loans and investments from Plaintiffs under the pretense those funds would be used for legitimate business purposes of the Company, when in fact Dundas and Bousis planned all along to use the money to fund their lavish lifestyle.

53.     Dundas and Bousis engaged in this self-dealing without regard to the consequences to the Company because they knew that if the Company became insolvent, the Designs, Brand and IP Assets would revert to Dundas and Bousis for their own use.

54.     Dundas and Bousis fraudulently concealed this scheme from Plaintiffs. Had Plaintiffs known Dundas's and Bousis's true intentions, they would not have invested in or made loans to the Company.

55.     As a direct and proximate consequence of Dundas's and Bousis's fraud, Plaintiffs were damaged in an amount roughly equal to $15,000,000.

56.     Moreover, to the extent Dundas and Bousis have derived financial benefit from their post-liquidation use of the Designs, Brand, and IP Assets, such benefit is a product of the fraud and should be disgorged.

## COUNT TWO
### FRAUDULENT INDUCEMENT
**(Against All Defendants)**

57.     Plaintiffs restate and reallege Paragraphs 1 through 56 of the Complaint as if fully set forth in this Paragraph.

58.     Dundas and Bousis fraudulently induced Plaintiffs to make the foregoing

13

4861-4811-9006.3

investments in and loans to the Company by repeatedly and falsely representing that Dundas and Bousis intended to put the interest of the Company first and use those funds prudently for legitimate business purposes.

59.    From the outset, Dundas and Bousis had no such intention. They planned to use and did use the Company as a vehicle to raise funds for themselves, after which they intentionally caused the Company to go into liquidation, which resulted in the Brand and IP Assets reverting to Dundas and Bousis for their own use.

60.    Dundas and Bousis fraudulently concealed their true motives. Had Plaintiffs known Dundas's and Bousis's true intentions, they would not have invested in or made loans to the Company.

61.    As a direct and proximate consequence of Dundas's and Bousis's fraud, Plaintiffs were damaged in an amount roughly equal to $15,000,000.

62.    Moreover, to the extent Dundas and Bousis have derived financial benefit from their post-liquidation use of the Designs, Brand, and IP Assets, such benefit is a product of the fraud and should be disgorged.

**COUNT THREE**
**VIOLATION OF UNIFORM VOIDABLE TRANSFER ACT**
**CIVIL CODE §§ 3439.04(a)(1) and 3439.08 (Actual Fraud)**
**(Against All Defendants)**

63.    Plaintiffs restate and reallege Paragraphs 1 through 62 of the Complaint as if fully set forth in this Paragraph.

64.    At all relevant times, Plaintiffs were creditors of the Company.

65.    As a consequence of Dundas and Bousis's unlawful conduct described herein, the Company was forced into an avoidable liquidation and its most valuable assets – the Designs, Brand, and IP Assets – were transferred to Dundas and Bousis.

66.    Dundas and Bousis carried out this scheme with actual intent to defraud Plaintiffs as evidenced by, among other things:

(A)    Dundas and Bousis were insiders of the Company;

14

(B)    The transfer of the Design, Brand, and IP Assets constituted a transfer of substantially all the Company's assets;

(C)    Dundas and Bousis provided nothing of value – let alone an equivalent value – in exchange for the Company's transfer of the Designs, Brand, and IP Assets;

(D)    At the time of the transfer, Dundas and Bousis knew that the Company was in financial distress and that, as a consequence of the transfer, it would be unable to pay its debts as they became due.

(E)    The Company was insolvent or became insolvent shortly after the transfer was made;

(F)    The transfer occurred shortly after Plaintiffs made substantial investments in and loans to the Company;

(G)    Shortly after the transfer, Dundas and Bousis used the Designs and possibly the Brand and IP Assets to sell couture for the exclusive benefit of themselves; and

(H)    Shortly after the transfer, Dundas and Bousis formed a new company to monetize the Brand and IP Assets for the exclusive benefit of themselves.

67.    As such, the Company's transfer of the Designs, Brand, and IP Assets to Dundas and Bousis constituted a fraudulent transfer under the Sections 3439.04(a)(1) and 3439.08 UFTA, and Plaintiffs are entitled to an order setting aside the transfer and awarding all other remedies as may be available to them under the UFTA.

**COUNT FOUR**
**VIOLATION OF UNIFORM VOIDABLE TRANSFER ACT**
**CIVIL CODE §§ 3439.04(a)(2) and 3439.05 (Constructive Fraud)**
**(Against All Defendants)**

68.    Plaintiffs restate and reallege Paragraphs 1 through 67 of the Complaint as if fully set forth in this Paragraph.

4861-4811-9006.3

69.    The Company's transfer of the Design, Brand, and IP Assets to Dundas and Bousis was made without receiving a reasonably equivalent value in exchange for the transfer, and the Company was engaged in a business for which the remaining assets of the Company were unreasonably small in relation to the business.

70.    As such, the Company's transfer of the Design, Brand, and IP Assets to Dundas and Bousis constituted a constructively fraudulent transfer under the Sections 3439.04(a)(2) and 3439.05 of the UFTA, and Plaintiffs are entitled to an order setting aside the transfer and awarding all other remedies as may be available to them under the UFTA.

**COUNT FIVE**
**DECLARATORY RELIEF**
(**Against all Defendants**)

71.    Plaintiffs restate and reallege Paragraphs 1 through 70 of the Complaint as if fully set forth in this Paragraph.

72.    S.14 of the UK Corporate Insolvency and Governance Act 2020 provides that: "(4)Where—(a) under a provision of a contract for the supply of goods or services to the company the supplier is entitled to terminate the contract or the supply because of an event occurring before the start of the insolvency period, and (b) the entitlement arises before the start of that period, the entitlement may not be exercised during that period."

73.    The License Agreement, to which the Company was a party, stated it would terminate upon, among other things, the occurrence of an "Insolvency Event" concerning the Company.  The IP Deeds provided that in the event the License Agreement was terminated, the Brands would be reassigned to Dundas and Bousis, respectively.

74.    Pursuant to S.14 of the UK Corporate Insolvency and Governance Act 2020, the provision of the License Agreement that provided the agreement would terminate upon the insolvency of the Company was of no force or effect upon the

16

Company's insolvency.

75.    Accordingly, the Plaintiffs are entitled to a declaration that pursuant to S.14 of the UK Corporate Insolvency and Governance Act 2020: (i) the License Agreement was not terminated by the Company's insolvency; and (ii) the Brand was not transferred to Dundas and Bousis.

## COUNT SIX
## UNJUST ENRICHMENT
### (Against All Defendants)

76.    Plaintiffs restate and reallege Paragraphs 1 through 75 of the Complaint as if fully set forth in this Paragraph.

77.    By their wrongful acts described herein, Dundas and Bousis unjustly received a benefit – the Designs, Brand, and IP Assets – which benefit they have retained to the detriment of the Company and its creditors, the Plaintiffs.  The Company received no value or benefit from the transfer of the Designs, Brand, and IP Assets to the Defendants.

78.    To the extent Dundas and Bousis have used the Designs, Brand, and IP Assets for personal gain, their receipt and retention of that gain, too, is unjust.

79.    Principles of equity, public policy, and good conscience dictate that Dundas and Bousis be ordered to pay restitution and disgorge such sums as is proven by the evidence.

## COUNT SEVEN
## MONEY HAD AND RECEIVED
### (Against All Defendants)

80.    Plaintiffs restate and reallege Paragraphs 1 through 79 of the Complaint as if fully set forth in this Paragraph.

81.    Plaintiffs invested in and made loans to the Company for the benefit of the Company and its shareholders, including Mrs. Siegel-Magness.

82.    To the extent Defendants used the Company's funds for their own purposes

17

and not for legitimate business purposes, they are indebted to Plaintiffs for money had and received by Defendants for the use of Plaintiffs.

## COUNT EIGHT
### SHAREHOLDER DERIVATIVE COMPLAINT
### (Against Nominal Defendant Dundas World)

83.    Plaintiffs restate and reallege Paragraphs 1 through 82 of the Complaint as if fully set forth in this Paragraph.

84.    At all relevant times, Mrs. Siegel-Magness was a shareholder and one of only three board members of the Company (the others being Defendants Bousis and Dundas) and Mango Dundas was a shareholder of the Company.

85.    The Defendants were directors of the Company from its founding and continued to be so when it entered into liquidation and had a duty to promote the success of the Company (in the interests of its shareholders when solvent and in the interests of its creditors from when it appeared likely to enter an insolvency process) and to scrupulously observe their other fiduciary duties under the Companies Act 2006.

86.    The Defendants violated the Companies Act 2006 and their fiduciary duties to the Company, and acted in bad faith and contrary to the interests of both shareholders and creditors (whose interests they were then required to afford priority) when they refused to implement the Reorganization Plan and instead determined to put the Company into liquidation, which resulted in the transfer of the Brand and IP Assets to themselves (via Dundas IP).

87.    Dundas also absconded with the Designs without paying any compensation to the Company.

88.    The Designs, Brand, and IP Assets were the most valuable assets of the Company.

89.    The Defendants' actions violated Section 172 of the Companies Act 2006 because as a result the Company was placed into liquidation and stripped of its most

4861-4811-9006.3

valuable assets.

90.    The Defendants were directors of the Company from its founding and continued to be so when it entered into liquidation and had a duty to avoid conflicts of interest under Section 175 of the Companies Act 2006.

91.    The Defendants violated Section 175 of the Companies Act 2006 and failed to avoid a situation in which they have a direct or indirect interest that conflicts, or possibly may conflict, with the interests of the Company.

92.    The Defendants failed to avoid a conflict of interests when placing the Company into liquidation because they personally benefitted from the resulting transfer of the Brand and IP Assets to themselves.

93.    The Defendants were directors of the Company from its founding and continued to be so when it entered into liquidation and had a duty to avoid conflicts of interest under Section 177 of the Companies Act 2006.

94.    Under Section 177 of the Companies Act 2006, if a director of a company is in any way, directly or indirectly, interested in a proposed transaction or arrangement with the company, that director must declare the nature and extent of that interest to the other directors.

95.    The Defendants violated Section 177 of the Companies Act 2006 when placed the Company into liquidation and failed to declare to the other directors that they would personally benefit from the resulting transfer of the Brand and IP Assets to themselves.

96.    As a direct and proximate result of Defendants' breaches of fiduciary duty and unlawful conduct, the Company suffered the loss of its most valuable assets, which were transferred to Defendants for no value, let alone equivalent value, leaving the Company utterly insolvent and without means to regain solvency.

97.    Plaintiff Mrs. Siegel-Magness brings this cause of action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be

suffered, by the Company as a direct result of the breaches of fiduciary duty and unlawful conduct of Defendants as described above.

98.    Plaintiff Mrs. Siegel-Magness will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

99.    The Company is named as a nominal Defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Prosecution of this action, independent of the Board of Directors, is in the best interests of the Company.

100.    The wrongful acts complained of herein subject, and will continue to subject, the Company to ongoing harm because the Company no longer has means to be a going concern without the IP Assets.

101.    The wrongful acts complained of herein were unlawfully concealed from the Company's shareholders.

102.    Mrs. Siegel-Magness did not make any demand on the current directors, the Defendants themselves, to institute this action as such demand would be a futile and useless act because the Defendants have a clear conflict of interest and have shown they are not capable of making an independent and disinterested decision to institute and vigorously prosecute an action against themselves.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs seeks judgment as follow:

a.    Awarding Plaintiffs damages in the amount of $15,000,000 or such other amount as proven at trial, together with interest and attorneys' fees;

b.    Declaring that the License Agreement was not terminated;

c.    Avoiding the Company's transfer of the Brand and IP Assets to Defendants;

d.    Directing Defendants hold in constructive trust any property or moneys properly belonging to the Company or its creditors;

4861-4811-9006.3

e.   Directing Defendants to account to the Company for all damages sustained or to be sustained by the Company for the wrongs alleged herein;

f.   Declaring that the License Agreement was not terminated and the Brand and IP Assets were not transferred to Dundas and Bousis upon the Company's insolvency by virtue of S.14 of the UK Corporate Insolvency and Governance Act 2020;

g.   Awarding to the Company restitution from Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

h.   Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys; fees and costs; and

i.   Any other relief that the Court may deem just and proper.

Respectfully submitted,

Dated:  September 4, 2024        NIXON PEABODY LLP

By: _____

Lauren Kim
Michael J. Summerhill
Keith E. Edeus, Jr.
Ethan E. Trull
Attorneys for Plaintiff
MANGO DUNDAS, LLC
MANGO LENDING COMPANY, LLC
SARAH SIEGEL-MAGNESS

4861-4811-9006.3

1

## <u>VERIFICATION</u>

2   **Sarah Siegel-Magness**, being duly sworn, deposes and says that she is the

3

4   Plaintiff in the above-entitled action, that she has read the foregoing *Verified Complaint*,

5   and that the facts set forth therein are true to the best of her knowledge, except as to

6   matters therein stated to be upon information and belief, and as to those matters, she

7   believes them to be true.

8   Sept. 4, 2024

9   Date: ~~August   , 2024~~

10                                                                                      Sarah Siegel-Magness

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

22

1

## **DEMAND FOR JURY TRIAL**

2

3          Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs

4     MANGO DUNDAS, LLC, MANGO LENDING COMPANY, LLC, and SARAH

5     SIEGEL-MAGNESS **individually, and derivatively on behalf of nominal**

6     **defendant, Dundas World Limited** hereby demand a trial by jury as to all issues and

7     claims so triable in this Civil Action.

8      Dated:  September 4, 2024            NIXON PEABODY LLP

9

10                                          By: _____

11                                                Lauren Kim
                                                 Michael J. Summerhill
12                                                Keith E. Edeus, Jr.
                                                 Ethan E. Trull
13                                                Attorneys for Plaintiff
                                                 MANGO DUNDAS, LLC
14                                                MANGO LENDING COMPANY, LLC
                                                 SARAH SIEGEL-MAGNESS

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

4861-4811-9006.3